UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80928-CIV-HURLEY

**FLORIDA AIRMOTIVE, INC.,**
    **plaintiff,**
**vs.**

**DERYL PERRY d/b/a PERRY ENTERPRISES,**
    **defendants.**
_____/

**OPINION ORDER & FINAL JUDGMENT**

**THIS CAUSE** came before the court for bench trial upon the complaint of plaintiff Florida Airmotive, Inc. ("Florida Airmotive") against defendant Deryl Perry d/b/a Perry Enterprises ("Perry"), together with the counterclaim of defendant/counter-plaintiff Deryl Perry against the plaintiff/counter-defendant Florida Airmotive.

Florida Airmotive, Inc. ("Florida Airmotive"), the prospective purchaser of fourteen mobile airplane hangars under two separate purchase and sale agreements, sues the prospective seller, Deryl Perry ("Perry"), alleging Perry's failure to perform as required under the contracts. Perry contends that he did perform, or was ready, willing and able to perform, but that the actions of Florida Airmotive prevented or hindered his ability to complete the performance. Perry accordingly counterclaims against Florida Airmotive for breach of contract seeking recovery of the balance of installment monies owed under the contracts.

1

A bench trial on the claims and counterclaims concluded before the undersigned on February 4, 2008. Having carefully reviewed all of the testimony and exhibits admitted at trial, the court now makes the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

1. Florida Airmotive is a fixed based operator which operates on a general aviation airport, Palm Beach County Park Airport, in Lantana, Florida. Since 1986, it has leased property for its operations at that airport from Palm Beach County. Under its lease, it was permitted to make improvements to the property provided that it first obtained approval from the Palm Beach County Department of Airports, and then obtained all necessary building permits.

2. In the late 1990's, Florida Airmotive began developing a plan to install multiple mobile T-hangars at the airport, with the intention of selling the hangars to private airplane owners and then leasing the underlying ground rights for profit.

3. In late 2000, Florida Airmotive, through its then President Owen Gassaway ("Gassaway") initiated hangar sale discussions with Deryl Perry ("Perry"), a Georgia resident who designs and manufactures mobile airplane hangars for airports and owners of private aircraft in the southeastern and mid-Atlantic states. Toward the end of 2001, Gassaway paid Perry $10,000 as an advance for development of what has been referred to as the TP-3000 model hangar series.

4.   On July 14, 2004, the Palm Beach County Development Review Committee approved Florida Airmotive's plan to install 50 hangars at the Lantana Airport.

5.   With this threshold government pass in place, Florida Airmotive and Perry entered into two separate contracts for the purchase and sale of airport hangars at the Lantana Airport. Under the first contract entered January 18, 2005 (the "first contract"), Perry agreed to construct, deliver and install four TP-3000 mobile airplane hangars at the Lantana Airport at a cost of $22,500.00 each, for a total purchase price of $90,000.00. Under the second September 9, 2005 contract (the "second contract"), Perry agreed to construct and install ten more TP-3000 hangars at a cost of $27,000.00 each, for a total purchase price of $270,000.00.

6.   Both contracts placed the risk of obtaining all necessary government approval and building permits on Florida Airmotive. The contracts more specifically provide:

> Seller is not responsible for obtaining any building permits or any other permits required by law related to the installation of said hangars. Seller is not responsible for any violation of any statute, regulations, or ordinance, or covenant, or other contractual provision that may exist between Buyer and a third party that may occur because of the installation of Seller's product. Compliance with said laws and contracts are entirely the responsibility of Buyer.

7. During this litigation, the parties further stipulated that the contracts impliedly required construction which complied with the Florida Building Code ("FBC" or "Code") without specifying which version or effective date of the Code is applicable, together with documentation certifying such compliance. [Pretrial Stipulation, ¶5.o].

8. At the time the first contract was signed in January, 2005, the 2001 FBC was in effect. However, at that time both parties were aware that the Code had been revised in response to recent hurricane activity in South Florida, and that an upgraded Code, the 2004 FBC, was scheduled to take effect on October 5, 2005. It was the intention and expectation of both parties that hangar installation would be completed before the effective date of the new Code in order to avoid its heightened requirements. In this vein, the contract itself, while not reciting a closing date, expressly provides that the seller will deliver and install the hangars within four to six weeks unless otherwise specified.

9. Perry created the design for the TP-3000 mobile hangar series and hired the engineering firm of Lockwood Greene to develop the building plans for its construction. In February, 2005, Perry delivered the drawings and building calculations for the hangars to Florida Airmotive, recognizing that Florida Airmotive intended to use his drawings to obtain permission to install the hangars from the Palm Beach County Department of Airports ("DOA"), and to obtain permits for their construction and installation from Palm Beach County.

10. In March, 2005, Florida Airmotive delivered Perry's drawings to the Department of Airports seeking its initial approval of the proposed construction. In addition to Perry's documents, Florida Airmotive submitted a July 14, 2004 Airport Site plan approved by the DRC; a March 2, 2005 hangar floor plan prepared by Paul Pefley, P.E. of Forest Hill Engineering; and a site plan prepared by Miller Engineering dated March 1,

4

2005. The DOA thereafter submitted Florida Airmotive's hangar proposals and all accompanying documents to its engineering firm, CH2M Hill, for review and comment.

11. On September 9, 2005 the parties entered into the second contract which called for ten more hangars to be constructed under the same plans developed for the first contract. At this time, Perry expressed to Gassaway his concern about the feasibility of installing the hangars before the effective date of the new Code. He expressed his awareness that the more stringent standards of the 2004 Florida Building Code would be taking effect on October 1, 2005, and reminded Gassaway that Florida Airmotive would need to comply with these standards unless it was able to obtain approval of the plans and drawings before from the DOA before October 1, 2005.

Gassaway, however, assured Perry that he was confident he could obtain the permits in time, explaining that "he had some issues with the airport" which he needed to resolve. [Tr. P. 118]

12. On September 22, 2005, Stephen Ciulla ("Ciulla") an engineer from CH2M, completed his review of Florida Airmotive's hangar proposal and prepared a memorandum to the CH2M Hill Project Manager, Philip E. Partenheimber, outlining perceived deficiencies in the plans and questioning the sufficiency of the supporting documentation.[1]

---

[1] For example, Ciulla determined that anchor testing conducted by Perry in Georgia was insufficient because it did not resemble soil conditions in Lantana Florida He also commented on a Lockwood Greene letter dated June 10, 2003, requesting additional documents from Perry before

13. On November 14, 2005, CH2M Hill Project Manager Philip E. Partenheimber reported to the DOA that the proposed hangars were not suitable for the Airport from a structural perspective, or ready for submission to permitting authorities due to inconsistent and insufficient documentation relating to the hangars' compliance with the 2004 FBC. In addition, Partenheimber reported that the submission required a revised site plan, geotechnical information, detail for a wash rack, detail for conventional hangars and an architectural review of the hangars.

14. In December, 2005, Gassaway continued to assure Perry that "everything was fine" and that "he was going to have them [the permits] every (sic) day." [Tr. 120]. Gassaway told Perry in this regard that "he had everything worked out with the airport people, that all he had to do was submit it, and he would have the permits immediately." [Tr. 159].

15. On December 12, 2005, the DOA sent a letter to Florida Airmotive reporting these findings and rejecting its proposal to install the hangars at the airport. However, the DOA invited Florida Airmotive to submit another set of signed and sealed hangar plans after correction of the identified deficiencies.

---

it would seal the drawings. He also expressed concern that Lockwood Grene had analyzed the hangars' compliance with the International Building Code, which is inapplicable in Florida, instead of the Florida Building Code. Finally Ciulla commented that the STAAD analysis, prepared by Lockwood Greene, describing the geometry of the hangars' structure, was inconsistent with the drawings of the hangars.

16. On December 27, 2005, Florida Airmotive faxed a copy of the DOA report to Perry, requesting Perry to respond to the outlined structural engineering deficiencies with updated drawings. Perry received the report on the first or second of January, 2006, his first notice of any problem from governmental regulatory authorities concerning the adequacy of the building plans.

17. Perry promptly forwarded the DOA memo to his attorney and to David Knight, the Lockwood Greene engineer who created the plans.

18. After receiving Knight's response in May, 2006, Perry called Gassaway and advised that another engineering firm would need to be consulted if Gassaway wanted to revise the plans to achieve 2004 Florida Building Code compliance. Gassaway directed him to secure the bid, and Perry proceeded to contact MACTEC, an engineering firm in Atlanta, Georgia.

19. In May, 2006, Perry and Gassaway discussed the cost of re-engineering the documents to meet the 2004 Florida Building Code. Perry advised that it would cost Gassaway another $30,000.00 to have the plans redrawn by MACTEC if he wanted to proceed with revised drawings. Gassaway said he would "sleep on it," and the next day called Perry back with an offer to pay the additional monies on condition that Perry transfer ownership of his intellectual rights over the hangar design to Florida Airmotive.

Perry, who then had a patent pending on the design, declined and countered with an offer to split the cost of obtaining upgraded drawings. Gassaway refused, and negotiations

for modification of the contract broke down. By that point, Florida Airmotive had paid a cumulative total of $235,000.00 toward the total purchase price of the hangars, leaving a $145,000.00 balance outstanding.

20. Perry continues to house the constructed hangars at his facility in Georgia. By his own testimony, the hangars are now worthless due to exposure to the elements.

21. Perry never submitted supplemental or revised 2004 FBC compliant building documents to Florida Airmotive, and Florida Airmotive never received DOA approval to install the hangars at the Lantana Airport

22. Perry owns the patents on the TP-3000 hangar series design, and is the sole proprietary owner of all the engineering drawings and documents associated with the TP-3000 hangar series.

23. Owen Gassaway Sr. passed away in December, 2007, shortly prior to the time of trial. His son, Owen Gassaway III, an officer and Vice President of Florida Airmotive, testified at time of trial as corporate representative of plaintiff Florida Airmotive.

## II. CLAIMS AND DEFENSES

Florida Airmotive sues Perry for breach of contract seeking to recover the $235,000.00 it paid toward the purchase price of the hangars, as well as lost profits flowing from lost sales of the fourteen hangars to private owners ($7,2000) lost leasing income on the hangar project ( $278,604.00) projected over a ninety-month term, and incidental damages of $6300 for geotechnical testing and $175.00 fee incurred in revising the site plan.

Perry contends that he substantially performed all obligations under the contracts, and that delays attributable solely to Florida Airmotive prevented him from completing delivery and installation before the 2004 Florida Building Code took effect on October 5, 2005.

In the alternative, Perry raises the affirmative defense of impossibility of performance, arguing that he contracted to deliver hangars in compliance with the 2001 FBC, and that his performance was rendered impossible by intervening changes in the building code.

Additionally, Perry counterclaims against Florida Airmotive for breach of contract, seeking recovery of the $140,000.00 unpaid balance under the contracts.

## II.  CONCLUSIONS OF LAW

1. As a threshold proposition, the court finds that the contracts are ambiguous on the issue of whether construction in compliance with the Florida Building Code in effect at the time of execution was required, or whether compliance with the the Code in effect at the time of installation was required.

Due to this ambiguity, the court appropriately considers extrinsic evidence of the parties' intent in its construction of the contracts. *See  e.g.  Emerald Pointe Property Owners' Ass'n, Inc. V Commercial Const. Industries, Inc.,* ___ So.2d ____, 2008 WL 173390 (Fla. 4th DCA April 16, 2008). Having considered the testimony of Perry on this issue, the court now concludes as a matter of law that both contracts impliedly required 2001 FBC

compliance.

In January, 2005, both parties knew that FBC 2001 would become obsolete on October 1, 2005, and both fully intended and contemplated that government approval and permitting process would be completed before that time, allowing the buildings to be installed before the new Code took effect.

When they entered into the second contract in September 2005, for construction of 10 additional hangars using the same plans as developed under the first contract, both parties still contemplated and intended 2001 FBC compliance. Perry specifically discussed this issue with Florida Airmotive's principal, Owen Gassaway, Sr., who expressed continued confidence in his ability to secure the necessary building approval and permitting prior to the October 2005 deadline.

However unrealistic this expectation might have been at that late date, the court finds Perry's undisputed testimony on this point to be credible. This expressed intention and awareness on the part of Gassaway, in turn, disables Florida Airmotive's current assertion that compliance with the enhanced building code requirements of the 2004 FBC was a basic assumption on which the second contract was founded.

2. By expressly assuming the burden of obtaining all necessary government approval and building permits, Florida Airmotive assumed the risk that the specifications and drawings would become obsolete if it failed to secure the requisite approvals before October 1, 2005

3. Perry substantially performed under both contracts by tendering 2001 FBC compliant drawings and specifications in February 2005, by constructing the first four hangars, and by remaining ready, willing and able to deliver and install all of the hangars upon instruction from Florida Airmotive which had the primary and sole obligation to obtain the preliminary government approval and permitting.

4. Florida Airmotive prevented or hindered Perry from delivering the hangars and completing performance by failing to obtain the requisite government permitting and approvals prior to the anticipated change in the Florida Building Code effective October 5, 2005, a risk it expressly assumed under both contracts. Because Florida Airmotive failure to satisfy its own contractual obligations prevented or hindered the performance of Perry, Florida Airmotive itself stands in breach of the contracts, *Gulf Am Land Corp v Wain*, 66 So.2d 763 (Fla. 3d DCA 1964). This breach impeded and excused Perry's performance and Florida Airmotive cannot now take advantage of its lapse by enforcing the contracts against Perry. *North Am Van Lines v Collyer*, 616 So.2d 177 (Fla. 5th DCA !993).

5. Although there is some evidence that the parties attempted to modify the contracts or enter a new contract to revive the construction plan after it became clear that installation of the hangars as contemplated under the first and second contracts would not be possible, the court concludes that no novation or modification of contract was achieved, leaving the obligations assumed by the parties under the first and second contracts intact.

5. The above finding of substantial performance by Perry renders it unnecessary for

11

the court to reach Perry's alternative affirmative defense of "impossibility".

6. Although the court finds Florida Airmotive in breach of the contracts, it further finds that Perry failed to mitigate his damages by making reasonable efforts to resell the hangars at a time when resale was possible. Accordingly, the courts finds Perry is not entitled to recovery of the $145,000.00 outstanding balance claimed under the first and second contracts.

### III. DECRETAL PROVISIONS

It is accordingly **ORDERED AND ADJUDGED**:

1. Finding insufficient evidence to sustain the claims of plaintiff Florida Airmotive against Deryl Perry, plaintiff Florida Airmotive shall take nothing on its claims in this action against defendant Perry, who shall go hence without day.

2. On the counterclaim of Deryl Perry against Florida Airmotive, the Court finds Florida Airmotive to be in breach of the first and second contracts, but finds that Perry is entitled to no damages for the breach due to his failure to mitigate damages.

3. The court reserves jurisdiction to tax costs.

**DONE AND ORDERED** in West Palm Beach, Florida this 30th day of May, 2008.

_____
Daniel T. K. Hurley
United States District Judge